IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA S. ROBERTS, Plaintiff, v. COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, Defendant, | ) | Civil Action No. 25-633 |

MEMORANDUM OPINION

## I. INTRODUCTION

Pending before the court is an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claim of Lisa S. Roberts ("plaintiff") for supplemental security income ("SSI") under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 405(g), 1383(c)(3). Plaintiff contends that the Administrative Law Judge ("ALJ") a) improperly failed to comply with the Appeals Council's remand order to adequately evaluate opinion evidence from medical sources, provide in the decision more thorough explanations of the persuasiveness of the opinions, and articulate how the ALJ considered each opinion when formulating plaintiff's residual functional capacity ("RFC"); b) by finding all the medical source opinions partially persuasive, failed to identify how conflicting limitations were reconciled; c) ignored the results of objective neuropsychological testing, despite finding this testing reliable and misapplying SSR 96-8p by cherry picking sporadic activities to explain symptom evaluation rather than utilize plaintiff's testimony, which was consistent with the results of the cognitive testing results, and resulted in an RFC that did not contain "all" of

plaintiff's impairments; and d) presented hypotheticals to the vocational expert ("VE") that omitted work-preclusive limitations about which plaintiff testified, and which were consistent with the cognitive testing results.

Plaintiff asserts that the ALJ's decision is not supported by substantial evidence and should be reversed. It is plaintiff's contention that the case should be remanded for the ALJ to consider properly all the evidence of record, including plaintiff's self-described conditions that are consistent with the recommendation made by her medical providers, in calculating plaintiff's RFC. The Commissioner asserts that the ALJ's decision is supported by substantial evidence and the Commissioner's decision should be affirmed.

Plaintiff filed a brief (ECF No. 17) which is the appropriate means to seek relief. Fed. R. Civ. P. SUPP SS 6. The Commissioner filed a brief in opposition to plaintiff's motion for summary judgment asserting that the ALJ's decision should be affirmed. (ECF No. 18.) For the reasons set forth below, the court will affirm the decision of the Commissioner.

## II. PROCEDURAL HISTORY

On February 18, 2021, plaintiff protectively filed the current Title XVI application for SSI, and noted her disability began on May 11, 2019. (R. at 10.) The claim was initially denied on August 10, 2021, and again upon reconsideration on February 14, 2022. (Id.) On March 9, 2022, plaintiff requested a hearing, which was conducted by telephone before the ALJ on July 6, 2022. (Id.) Plaintiff agreed to appear by telephone and testified at the hearing. (Id.) Plaintiff was represented by an attorney at the hearing. (Id.) An impartial vocational expert also testified at the hearing. (Id.)

In a decision dated August 15, 2022, the ALJ determined that plaintiff was not disabled within the meaning of the SSA under §§ 216(i) and 223(d) and although plaintiff had no past relevant work, there were sufficient jobs that exist in the national economy that she could perform. (R. at 24.) Plaintiff timely requested a review of that determination and by letter dated June 1, 2023, the Appeals Council denied the request for review and the decision of the ALJ became the final decision of the Commissioner. (R. at 1-4.) Plaintiff subsequently commenced an action seeking judicial review.

In an unopposed motion to the court, the Commissioner determined "further evaluation of Plaintiff's claims is warranted" and requested to vacate the proceedings, instructing the ALJ to conduct "further administrative proceedings and further evaluation of the evidence and to issue a new decision." (Civ. No. 23-1369, ECF No. 13.) The motion for remand was granted and a final judgment was ordered by the court on November 30, 2023. (Civ. No. 23-1369, ECF No. 14.)

The ALJ commenced a second hearing by video on February 12, 2025, where, again, plaintiff, who was accompanied by an attorney, agreed to appear and testify. (R. at 918-935.) An impartial VE, who was not the same vocational expert that testified at the previous hearing, also appeared and testified. (Id.) The ALJ's introductory remarks at the hearing indicated the focus of the hearing would be "to make a new and independent decision following the District Court and Appeals Council remand order." (R. at 920.)

At the February 12, 2025 hearing, the ALJ reviewed the exhibits and documents in the record with plaintiff's attorney. (R. at 920-21.) Plaintiff's attorney acknowledged and concurred with the exhibits in the record as currently submitted. (R. at 921.) Plaintiff's attorney stated that

> 5F, 6F, and 29F are the key documents in this case. … I think it's really accurate to say she is probably limited to six hours sitting, one hour standing, one hour walking. But that examiner also had a quiet limitation along with I think again that's pretty accurate.

(R. at 922.) The ALJ then remarked:

> The remand order was related to assessment of that medical opinion you highlighted, 29F, not 26F it looks like we had at the prior hearing. 29F is new, correct?
> [Plaintiff's attorney responded:] Correct. That's the new neuropsychological testing.

(Id.)

In a decision dated March 5, 2025, the ALJ determined that plaintiff met her burden for steps one, two, and four of the sequential analysis. At step three, the ALJ determined plaintiff did not meet the criteria of a listing and at step five found that based on plaintiff's age, education, no past relevant work experience, and RFC, she was capable of performing jobs that exist in significant numbers in the national economy. (R. at. 906.) Plaintiff was found to be "not disabled" within the meaning of the SSA under §§ 216(i) and 223(d) and denied SSI. (R. at 907-08.) Plaintiff, having exhausted administrative remedies through the Social Security Administration, subsequently commenced this action seeking judicial review.

## III. LEGAL STANDARD OF REVIEW

Judicial review of the Commissioner's final decision denying a claimant's application for benefits is provided by federal law. 42 U.S.C. § 405(g). The judicial review of a final decision is plenary with respect to questions of law. Schaudeck v. Comm'r Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). With respect to factual findings, this court must determine whether there is substantial evidence which supports the findings of the Commissioner. "Substantial evidence is

'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389 (1971)). The deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).

This standard, however, does not permit the court to substitute its own conclusion for that of the fact-finder. Id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless whether the court would have differently decided the factual inquiry). The court will not affirm a determination by substituting what it considers to be a proper basis even if it might have reached a different conclusion. Sec. & Exch. Comm'n v. Chenery Corp., 332 U.S. 194, 196-7 (1947). "The reviewing court, however, does have a duty to review the evidence in its totality." Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (citing Daring v. Heckler, 727 F.2d 64, 70 (3d Cir.1984)). "As a part of this review, 'a court must 'take into account whatever in the record fairly detracts from its weight.'" Id. (citing Willbanks v. Sec'y of Health & Hum. Servs., 847 F.2d 301, 303 (6th Cir.1988) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). The Third Circuit Court of Appeals had held that an administrative law judge has a legitimate basis to discredit a medical opinion when there are inconsistencies and contradictory evidence in the record. See Hubert v. Comm'r of Soc. Sec., 746 F. App'x 151, 153 (3d Cir. 2018).

## IV. PLAINTIFF'S BACKGROUND AND MEDICAL EVIDENCE

### A. Plaintiff's Background

Plaintiff filed a previous application for benefits in September 2003 which was denied by at the initial level, with no appeals filed. (R. at 218.)

Plaintiff was born on March 9, 1979, and was 41 years old, a "younger individual," at the time her application for benefits was filed in 2021. (R. at 906, 920.) She graduated from high school, has a bachelor's degree in human resource management, and a master's degree in business administration. (R. at 1147.) Plaintiff lives with two of her children. (Id.) She is able to drive short distances, cook prepared meals, and assist her children with cleaning the bathroom and grocery shopping (R. at 1130-32.) Plaintiff has not had a full-time job since the 2006 birth of her disabled son. (R. at 203.) Since 2019, she alleges, because of multiple concussions that left her with headaches, dizziness, trouble concentrating, memory lapses, and difficulty with balance, plus her responsibilities caring for her disabled son, she has been unable to work. (R. at 282.) Plaintiff listed physical and mental conditions in her SSI application disability report. (R. at 222.) Plaintiff's current medication list includes: Adderall, Flovent, Effexor, hydroxyzine, spironolactone, albuterol, Vraylar, propranolol, sumatriptan, bupropion, melatonin, and Tylenol 800. (R. at 243, 1126.) Since plaintiff initiated the instant claim for SSI, she self-reports her symptoms are no better and her memory is worse. (R. at 923.)

### B. Medical Record

#### 1. Doctor Thomas Webster

On July 2, 2021, plaintiff was seen and evaluated by Thomas Webster, M.D., ("Dr. Webster"), for a consultative internal medicine evaluation for the Benefit Disability

Determination ("BDD") office's use in making a determination of disability. (R. at 402-19.) Following his one-time evaluation, Dr. Webster completed a medical source statement. (R. at 407-12.) He noted plaintiff's medical history, as plaintiff reported it to him. (R. at 418-19.) From his examination, Dr. Webster reported plaintiff had her first concussion at age seven; a severe concussion occurred in 2019, and another head injury re-aggravated symptoms approximately six months before Dr. Webster's appointment with plaintiff. (R. at 402.)

Dr. Webster prepared a medical statement of plaintiff's ability to do work-related activities, dated July 2, 2021, which was prior to the first administrative hearing on July 6, 2022. (R. at 407-12.) In that medical statement, Dr. Webster found plaintiff's abilities to sit limited to one hour at a time, for a total of six hours in an eight-hour workday, and standing or walking limited to ten minutes at a time for a total of one hour each in an eight-hour workday. (R. at 408.) He found plaintiff's use of her hands unrestricted, except for reaching with the right hand, which was limited to "frequently." (R. at 409.) He found plaintiff's postural limitations included: "never" for climbing ladders or scaffolds, and climbing; and "occasionally" for stooping, kneeling, crouching, or crawling. (R. at 410.) He opined plaintiff could "never" tolerate exposure to unprotected heights or vibrations, and "occasionally" tolerate humidity, wetness, dust, odors, fumes, extreme cold, or extreme heat. (R. at 411.) Dr. Webster noted plaintiff could not walk a block at a reasonable pace and could not climb steps at a reasonable pace. (R. at 412.) In a medical source statement, he filled the requested check-box forms, but did not provide explanatory statements in any of the free-form narrative areas. (R. at 407-12.)

### 2. Physician's Assistant Rachel Scaffardi

Plaintiff received ongoing care from the Excela Health Sport Medicine and Concussion Center. On March 10, 2022, Physician's Assistant Rachel Scaffardi ("PA Scaffardi") filled out a traumatic brain injury/concussion questionnaire for plaintiff, which was co-signed by James Masterson, D.O. (R. at 785-87.) In the questionnaire, PA Scaffardi noted that plaintiff had a traumatic brain injury and has daily episodes of dizziness that last for approximately ten minutes, come without warning, and can occur at any time throughout the day. (R. at 785.) PA Scaffardi indicated that plaintiff has "disorganization of function in two, resulting in extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or the use of upper extremities." (Id.) She reported plaintiff's symptoms, which have lasted for three months or greater, include: nausea/vomiting, visual disturbances, difficulty sustaining a routing, photosensitivity, sensitivity to noise, confusion, inability to sequence multi-step activities, mental confusion/inability to concentrate, fatigue/exhaustion/malaise, impaired balance/falling, and severe headaches, and will require plaintiff to have greater supervision than others. (R. at 785-86.) PA Scaffardi reported that plaintiff is unable to tolerate even "low stress" work, and plaintiff will be required to take four or more unscheduled breaks during an eight-hour working day, resulting in "off task" time of twenty-five percent or more. (R. at 786-87.) PA Scaffardi estimated, within a reasonable degree of medical certainty, plaintiff would require missing more than four days of work per month due to her impairments or treatment. (R. at 787.)

**3. Willowbrook Eye Care Associates**

On March 15, 2022, a provider at Willowbrook Eye Care Associates provided a vision impairment medical source statement for plaintiff. (R. at 789-91.) This provider (signature illegible) recorded plaintiff's symptoms to include blurriness, eye fatigue, double vision, and

occasional sensitivity to light. (R. at 789.) The provider noted plaintiff would be limited to "frequent" near and far acuity, and "occasional" depth perception and accommodation for both eyes. (R. at 790.) The provider reported plaintiff would have "occasional" difficulty walking up and down stairs, would have "occasional" ability to inspect shape and color of small object, read small print, operate a motor vehicle, or view a computer screen. (R. at 791.) The statement reflected that plaintiff's symptoms would be severe enough to interfere with attention, concentration, and work pace for even simple tasks twenty percent of a typical workday. (Id.) In an open field text, the provider wrote: "Lisa has prism in her glasses to try and reduce the double vision that she suffers from. Any eye fatigue may cause her double vision to worsen. Prolonged new work may bring on this fatigue and increase her symptoms." (Id.)

**4. State Agency Medical Health Reviewers**

Plaintiff's medical record file was reviewed by state agency consultants for independent disability determination analysis and RFC to work. (R. at 72-103.) Margel C. Guie, D.O., on August 10, 2021, noted findings about plaintiff's medical conditions. (R. at 72-91.) On reconsideration, Gregory Paul Mortimer, M.D., reviewed other medical conditions on February 14, 2022. (R. at 92-103.)

The medical health reviewers at both the initial determination and upon reconsideration assessed plaintiff's physical impairments to recommend plaintiff's RFC (R. at 81-83, 97-99.) The initial reviewer found a "severe" impact from "late effects of injuries to the nervous system; vestibular system disorders; depressive, bipolar related disorders; and trauma- and stressor-related disorders," while upon reconsideration, the reviewer instead found a "severe" impairment from "late effects of injuries to the nervous system; neurocognitive disorders; asthma; disorders

of muscle, ligament and fascia; depressive, bipolar related disorders; anxiety and obsessive-compulsive behaviors; and trauma- and stressor-related disorders." (R. at 78, 96.) On initial review, the examiner determined plaintiff was able to occasionally lift or carry up to fifty pounds and frequently lift or carry up to twenty-five pounds, but upon reconsideration, the reviewer determined plaintiff was able to occasionally lift or carry up to twenty pounds and frequently lift or carry up to ten pounds. (R. at 81, 97-98.)

Both reviewers found plaintiff was capable of standing, walking, or sitting for six hours in an eight-hour workday, and both recommended postural limitations: "occasionally" for climbing ladders/ropes/scaffolds, and "frequently" for climbing ramps/stairs, balancing, stooping, kneeling, and crouching, but differed on the limitation for crawling, with the initial reviewer finding it could "frequently" be performed, while upon reconsideration the reviewer found "occasionally" to be more appropriate. (R. at 82, 98.) Both reviewers agreed on the environmental limitations and recommended "unlimited" for extreme heat, wetness, humidity, and noise, "avoid concentrated exposure" to extreme cold, vibration, and fumes/odors/dust etc., and "avoid even moderate exposure" to hazards. (R. at 83, 99.) The reconsideration reviewer had Dr. Webster's examination available for review with the record and noted the following:

> The opinion stated within the report, dated 07/02/2021, provided by T. Webster, MD, an examining medical source, has been considered. The residual functional capacity assessment partially reflects the examiner's opinion. The examiner states that the claimant has some limitations in walking and standing. These statements of limitations are not very consistent with, or well supported by, the examiner's findings or the other evidence in file, and are not very persuasive. Other limitations indicated are fairly consistent with, and supported by, the examiner's findings and the other evidence in file, and are somewhat persuasive.

(R. at 99.)

Both reviewers found plaintiff's statements about her symptoms to be "partially persuasive" considering the medical evidence in the file and her described activities of daily living, which the reconsideration reviewer said were "not significantly limited." (R. at 84, 99.) While the initial reviewer found plaintiff to be capable of "medium" exertional work, and the reconsideration reviewer found her to be capable of "light" work, both reviewers, due to plaintiff's age, education, and RFC, recommended a finding of "not disabled" because plaintiff can adjust to other work. (R. at 89-90, 102.)

**C. Mental Health Record**

**1. Doctor Adrienne Gallo**

On July 14, 2021, plaintiff was seen and evaluated by Adrienne Gallo, Psy.D. ("Dr. Gallo"), for a consultative mental health status examination. (R. at 422-32.) In Dr. Gallo's one-time evaluation, she noted, among other things, plaintiff's reported history of weekly therapy and monthly consultation with a psychiatrist, with no reported history of psychiatric hospitalization. (R at 422.) Plaintiff's reported current functioning included:

> Difficulty falling asleep. Appetite: Up and down. Depressive symptoms: Dysphoric mood, guilt, hopelessness, loss of interest, irritability, fatigue, diminished self-esteem, concentration difficulties, and social withdrawal. Suicide and homicide: Denied. Anxiety; Excessive apprehension and worry, easily fatigued, irritable, fear of being judged, difficulty concentrating, and avoidance of social settings. Phobic response to the dark, height, and bugs. Trauma: Exposure to trauma, hyperstartle, hypervigilance, avoidance, and sleep disturbance. Panic attacks: Palpitations and breathing difficulties a few times a month randomly. … Cognitive: short-term and long-term memory deficits and concentration difficulties

(R. at 423.) Based on plaintiff's responses to questioning, Dr. Gallo reported plaintiff's expressive and receptive language was "adequate," but she appeared "mildly impaired due to anxiety and depression." (R. at 424.) She was able to complete counting and "serial 3s from 20.

She was unable to complete serial 7s from 100. … She was able to recall 3 objects immediately, 1 after delay, and produced 3 digits forward and 2 backward." (Id.) Dr. Gallo found plaintiff's prognosis to be "[g]uarded, given mild emotional distress." (R. at 425.)

Following her one-time evaluation of plaintiff, Dr. Gallo completed a medical source statement. (R. at 426-28.) Dr. Gallo indicated that plaintiff's impairments could affect the "ability to understand, remember, and carry out instructions." (R. at 426.) She found "mild [to] moderate" restriction to be able to "understand and remember simple instructions, [and to] carry out simple instructions;" "moderate" impact to "the ability to make judgments on simple work-related decisions," "moderate [to] marked" impact on the ability to "understand and remember complex instructions;" and "marked" impact on the ability to "carry out complex instructions, [and] the ability to make judgments on complex work-related decisions." (Id.) Dr. Gallo wrote that "depression, anxiety [and a diagnosis] of head injury" were the factors supporting this assessment. (Id.) Dr. Gallo found plaintiff's impairments also "moderate[ly]" affect her ability to "interact appropriately with the public" and "respond appropriately to usual work situations and to changes in a routine work setting." (R. at 427.) She also found plaintiff had "some difficulties concentrating." (Id.)

### 2. State Agency Mental Health Reviewers

Plaintiff's medical record file was reviewed by state agency consultants for independent mental health disability determination analysis and RFC to work. (R. at 72-103.) Mental health professional Roger K. Fretz, Ph.D., on July 19, 2021, provided a psychiatric review. (R. at 78-87.) On reconsideration, Susan Turner, Psy.D., on February 9, 2022, assessed plaintiff's mental health record. (R. at 96-101.)

The mental health reviewers of the file each considered plaintiff's "severe" impairments as listed in the state agency medical review section above. Neither reviewer found that plaintiff met the paragraph "B" criteria of the listings, with both reviewers finding a "mild" impairment in the area of "interact with others" and "moderate" limitations from the areas of "understand, remember, or apply information; concentrate, persist, or maintain pace; [and] adapt or manage oneself." (R. at 78, 96.) With respect to an understanding or memory limitation, both reviewers found plaintiff "not significantly limited" in the "ability to remember locations and work-like procedures, [and] the ability to understand and remember very short and simple instructions," but "moderately limited" due to the "ability to understand and remember detailed instructions." (R. at 85, 100.) With respect to a sustained concentration and persistence limitation, they each found her to be "moderately limited" in "ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, [and] ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (R. at 85-86, 100.) For adaptation limitations, the reviewers differed in their findings. (R. at 87, 101.) The initial reviewed found a moderate limitation in "ability to respond appropriately to changes in the work setting," while the reconsideration reviewer found a moderate limitation in "ability to set realistic goals or make plans independently of others." (Id.) The reconsideration reviewer noted:

> The opinion stated within the report received 7/14/21 provided by Adrienne Gallo, Psy.D., a medical source, has been considered. The residual functional capacity assessment partially reflects the opinion of the medical source….
> The claimant's basic memory processes are intact. The claimant can understand, retain, and follow simple instructions (i.e., perform one- and two-step tasks). The claimant can make simple decisions and would not require

> special supervision in order to sustain a routine. The claimant can perform simple, routine, repetitive tasks in a stable environment. The claimant is capable of performing within a schedule and at a consistent pace.
>
> …
>
> The claimant is able to meet basic mental demands on a sustained basis despite the limitations resulting from impairments.

(R. at 101.)

### 3. Lindsey A. Groves, Psychologist

Plaintiff saw Lindsey Groves, Psy.D., twice for cognitive evaluations. On the first occasion, plaintiff was referred by Dr. Masterson, from the Excela Health Sport Medicine and Concussion Center, to "assess her cognitive status and determine her level of functioning." (R. at 838.) This evaluation, conducted on May 4 and 15, 2020, had plaintiff perform a series of objective cognitive tests: the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV"), Wide Range Assessment of Memory and Learning – 2nd Edition ("WRAML2"), Comprehensive Trail Making Test ("CTMT"), Stroop Color Word Test – Adult Version, Controlled Oral Word Association Test ("COWAT"), and IVA-2 Continuous Performance Test ("IVA-2"). (R. at 839.)

On the WAIS-IV, plaintiff scored in the low average range on the Full Scale IQ test, in the "borderline" range for working memory, indicating her working memory is "severely impaired" and will impact her ability to attend to tasks and concentrate, and "borderline" on processing speed. (R. at 840.) On the WRAML2 test, plaintiff scored in the "impaired" category for verbal memory and general memory, and in the "borderline" range for visual memory and attention/concentration, indicating her ability to remember information in context was below par. (R. at 842.) The CTMT is used to detect problems with psychomotor speed, visual search, sequencing and attention. (Id.) Plaintiff scored "below average" in four of five test areas and "mild to moderately impaired" in the fifth and composite areas, indicating mild

impairment "on tasks that require simple and complex cognitive tasks. (Id.) On the Stroop Color and Word Test, which measures mental flexibility as well as processing speed, plaintiff scored "extremely low" in word score, color score, and color-word score, which is consistent with "acquired brain injuries." (R. at 843.) The COWAT language assessment measures verbal fluency to facilitate "information retrieval from memory;" plaintiff scored in the "borderline" range. (Id.) On the IVA-2 test to assess ADHD symptoms, the subject has to switch between sensory, auditory and visual, modalities; plaintiff scored extremely impaired in the auditory modality, and despite apparently understanding the task, was unable to appropriately respond to visual stimuli, resulting in invalid test scores in the visual categories. (Id.)

Dr. Groves opined that the results of these tests, considering plaintiff's "academic and occupational history," would indicate "cognitive functioning is likely below premorbid level of functioning, …[and] an acquired ADHD presentation secondary to traumatic brain injury." (R. at 845.) Plaintiff was recommended to "engage in exercises/activities that stimulate neuronal activity in the brain (e.g., games that stimulate the brain, puzzles, math problems, etc.)" and retest again in one to two years if symptoms continue. (Id.)

Following the order to remand for a second hearing to develop the record, (Civ. No. 23-1369, ECF No. 14), plaintiff was referred back to Dr. Groves, now at The Groves Psychological Center, for a repeated full cognitive evaluation to determine her current level of functioning based on concerns of continuing cognitive deficits. (R. at 1146-56.) On August 17, 2023, and October 17, 2023, Dr. Groves administered plaintiff the same series of widely regarded statistically objective psychological testing protocols. (Id.) On the WAIS-IV intelligence test, plaintiff scored "low average" in the areas of general intelligence and perceptual reasoning, and

"borderline" in working memory and processing speed. (R. at 1148.) Working memory includes tasks that "require an ability to attend and concentrate." (Id.) Plaintiff's scores from the first administration of the WAIS-IV to the second showed predominantly similar results, with the exceptions being a slight improvement in general knowledge and a marked decrease in visual pattern recognition. (Id.)

Plaintiff was administered the Wide-Range Assessment of Memory and Learning – 3rd edition, which replaced the 2nd edition test, and differentiated immediate memory from delayed memory. (R. at 1150.) Plaintiff scored "very low" or "extremely low" in all six core subtests, indicating plaintiff was "unable to remember information in context and rote recall in the auditory and visual modalities," and "her ability to attend and concentrate was severely impaired." (R. at 1151.) Plaintiff was also administered the CTMT – 2nd edition, where she scored "severely impaired" on the first and fifth Trail test, and "mild to moderately impaired" on the second, third and fourth Trail test. (Id.) Dr. Groves noted that plaintiff's scores on the CTMT were lower on the second cognitive assessment than they were on the 2020 test. (Compare R. at 842 with R. at 1151.) Plaintiff's scores on the Stroop Color and Word Test remained within the same classification as previously: "extremely low." (R. at 1152.) Plaintiff did, however, score within the normal range on the COWAT, a measure of verbal/phonetic fluency. (R. at 1153.)

On the Attention Assessment (IVA-2), plaintiff was assessed on intermixed auditory and visual stimuli and required to switch between sensory modalities. She was determined to have performed as "extremely impaired" for full scale attention quotient,[1] auditory attention quotient,

1. "The Full-Scale Attention Quotient (FAQ) provides a measure of the individual's overall

visual attention quotient, as well as full scale response control quotient,[2] visual response control, sustained auditory attention quotient, and sustained visual attention quotient.[3] (R. at 1153-1154.) She scored "severely impaired" for auditory response control, her highest score. (Id.)

With respect to results and recommendations, Dr. Groves found as follows:

> On the WAIS-IV, Ms. Roberts' verbal skills were intact with mild impairments in visual-spatial skills. Working memory and processing speed were severely impaired. These scores are relatively consistent with her scores from 2020 with a decline in visual-spatial skills. On the WRAML3, her scores indicated that her visual and verbal immediate and delayed memory was severely impaired. She struggled to recall information presented in contextual format for both modalities and attention/concentration was severely impaired. These scores were also consistent with testing from 2020. On the CTMT, Ms. Roberts' ability to process information was severely impaired on tasks that require simple and complex cognitive processing skills. Her current CTMT scores indicated a

---

ability to make accurate responses, stay focused, and sustain attention. The client received a FAQ score of 12. This score fell in the Extremely Impaired range. She received an Auditory Attention Quotient score of 12 (Extremely Impaired range) and a Visual Attention Quotient score of 29 (Extremely Impaired range)." (R. at 1153.)

2. "The Full-Scale Response Control Quotient (FRCP) is a global measure of the overall ability of the examinee to regulate responses and respond accordingly. This includes the ability to inhibit responses to non-target stimuli, the consistency of reaction times, and the ability to maintain mental process speed throughout the test. Ms. Roberts received a FRCP score of 54. This score fell in the Extremely Impaired range. She received an Auditory Response Quotient score of 67 (Severely Impaired range) and a Visual Response Quotient of 54 (Extremely Impaired range)." (R. at 1153.)

3. "The Auditory and Visual Attention Quotient is comprised of three components (Vigilance, Focus, and Speed). Vigilance measures general attentional ability. It is a measure of inattention evidenced by two different types of errors of omission. Individuals with low vigilance tend to be less watchful, careful, and attentive when completing a task. Ms. Roberts received an Auditory Vigilance score of 0 (Extremely Impaired range) and a Visual Vigilance score of 56 (Extremely Impaired range), Focus reflects the total variability of mental processing speed for all correct responses. This scale assesses an individual's ability to reliably sustain attention without "drifting off" or "tuning out." Low scores on this scale indicate an individual's attentional functioning was unreliable, erratic, and undependable. The client received an Auditory Focus score of 82 (Mildly Impaired range) and a Visual Focus score of 71(Moderately to Severely Impaired range). Speed reflects the average reaction time for all correct responses. It is used to identify attention processing problems related to slow discriminatory mental processing. Ms. Roberts received an Auditory Speed score of 18 (Extremely Impaired range) and Visual Speed score of 0 (Extremely Impaired range)." (R. at 1154.)

> decline from 2020 testing scores. On the Stroop, Ms. Roberts' scores reflected executive functions were severely impaired and were consistent from 2020 scores. The COWAT results indicate verbal fluency fell into the Normal range of functioning (38th percentile) and indicated improvement from the 2020 scores. Finally, the IVA-2 CPT indicated auditory and visual attention was severely impaired.

(R. at 1154-55.) From the Diagnostic and Statistical Manual of Mental Health, plaintiff was assessed to carry the following diagnoses: major neurocognitive disorder due to traumatic brain injury, without behavioral disturbance (F02.80), major depressive disorder, recurrent, moderate (F33.1), and generalized anxiety disorder with panic attacks (F41.1). (R. at 1154.)

## V. DISCUSSION

### A. Administrative Law Judge's Findings

Disability is defined under Title II of the SSA as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Similarly, a person is unable to engage in substantial gainful activity when his physical or mental impairment or impairments are of such severity that he is not only unable to do "his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 1382c(a)(3)(B).

Proceeding through the sequential evaluation process, the ALJ determined at step one that plaintiff had not engaged in substantial activity since her claimed disability date, (R. at 894); at step two acknowledged plaintiff had severe impairments of: traumatic brain injury, bilateral rotator cuff tear, depression, and anxiety, (id.); and at step three found that the plaintiff's

combination of impairments did not meet the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Id.). Plaintiff exhibited multiple moderate limitations, but none that rose to the level of serious or extreme as required to satisfy the "paragraph B" criteria, and the record of her conditions did not satisfy the "paragraph C" criteria. (R. at 896.)

Prior to commencing step four, the ALJ determined plaintiff's RFC. During the hearings, the ALJ heard testimony from plaintiff regarding her physical and mental limitations. (R. at 42-71, 918-35.) The ALJ considered plaintiff's medical record, to include the medical opinions and state administrative medical reviews, and found plaintiff's RFC as follows:

> [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant is capable of no climbing of ladders, ropes, or scaffolds; occasionally climbing ramps and stairs; frequently balancing, stooping, kneeling, crouching, and crawling; no concentrated exposure to extreme light such as sustained direct sunlight and strobes, loud noise such as heavy traffic and sirens, heat, cold, vibration, or environmental irritants such as fumes, odors, dust, gases, and areas of poor ventilation; no moderate exposure to hazards such as inherently dangerous moving machinery and unprotected heights; frequently reaching overhead bilaterally; frequent depth perception and no commercial driving; understanding, remembering, and carrying out detailed but uninvolved written or oral instructions; work duties and changes that must be explained, written, and/or demonstrated; no strict production rates such as assemble line work or hourly time quotas; and frequent interaction with others.

(R. at.896.) At step four, the ALJ determined that plaintiff had no past relevant work. (R. at 906.)

With respect to the findings at step five, the ALJ posited a series of hypothetical questions to the VE to determine whether there was work an individual with an RFC like plaintiff was capable of performing given the physical and mental limitations noted in the RFC findings. (R. at 931-33.) Utilizing plaintiff's data as a younger individual, with at least a high school degree, no vocational history, and based on her earlier testimony at the hearing, the VE

testified that there were a significant number of jobs available in the national economy at the light level that a hypothetical individual with an RFC like plaintiff would be capable of performing. (R. at 932.) The ALJ concluded at step five that there were "jobs that exist in significant numbers in the national economy that [plaintiff] can perform…." (R. at 906.)

### B. Alleged Errors

Plaintiff argues that the ALJ's decision was not supported by substantial evidence. She argues that the ALJ erred by failing to adequately evaluate opinion evidence from medical sources, and to provide in the decision more thorough explanations of the persuasiveness of the opinions, which the Appeals Council's remand order tasked the ALJ to do. (Pl.'s Br., ECF No. 17 at 9.) Specifically, plaintiff argues the ALJ did not adequately articulate how he considered each opinion when formulating plaintiff's RFC, and by finding all the medical source opinions partially persuasive, he failed to identify how conflicting limitations were reconciled. (Id. at 12.) Because the ALJ did not incorporate the results of objective neuropsychological testing, despite finding this testing reliable, plaintiff submits that the RFC is not an accurate reflection of her abilities, (id. at 13), and the examples the ALJ uses to counter plaintiff's statements about the intensity and limiting effects of her symptoms were cherry-picked statements that did not reflect her ability to perform sustained work. (Id. at 16.) Without an accurate RFC, plaintiff asserts that the hypotheticals presented to the VE, which omitted work-preclusive limitations, inaccurately identified jobs plaintiff might perform, and were similarly not supported by substantial evidence. Each argument will be addressed.

#### 1. Failure to Sufficiently Evaluate Opinion Evidence from Medical Sources and Provide a Thorough Explanation of the Opinion's Persuasiveness

Plaintiff's appeal of denial of SSI focuses on whether the ALJ erred when he found Dr. Webster's opinion partially persuasive, but failed to reconcile the RFC with the more restrictive limitations contained in Dr. Webster's opinion, or explain why he did not. (Pl.'s Br., ECF No. 17 at 9.) In essence, plaintiff is arguing those limitations would permit only sedentary work[4] – not light work,[5] which was included in the ALJ's determination of plaintiff's RFC.[6]

While the ALJ must develop the record and explain "how evidence in the record is treated. … The burden still 'lies with the claimant to develop the record regarding his or her disability because the claimant is in a better position to provide information about his or her own medical condition.'" Durden v. Colvin, 191 F. Supp. 3d 429, 449-50 (M.D. Pa. 2016) (quoting Money v. Barnhart, 91 F. App'x 210, 215 (3d Cir. 2004)). In Rutherford v. Barnhart, 399 F.3d 546, 554 (3d Cir. 2005), the court recognized that only "credibly established limitations" must be included in a residual functional capability determination.

> **The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability**," [and a]n ALJ is

4. "*Sedentary work*. The regulations define sedentary work involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles …. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. … [P]eriods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." Social Security Ruling 83-10.

5. "*Light work.* The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing -- the primary difference between sedentary and most light jobs. … the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Id.

6. Plaintiff's appeal does not contest the opinion of the ALJ relative to the findings for any other previously claimed physical limitation; accordingly, plaintiff's other impairments will not be addressed in this opinion. See United States v. Dowdell, 70 F.4th 134, 139 (3d Cir. 2023) (affirming the district court's finding that an "argument had never been made, so it was waived").

> specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion.

Densberger v. Saul, No. 1:20-CV-772, 2021 WL 1172982 at *7-8 (M.D. Pa. Mar. 29, 2021) (quoting 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c)) (emphasis added).

The ALJ considered and addressed the supportability and consistency of Dr. Webster's opinion. He explained why the opinion of Dr. Webster was considered, but found to be partially persuasive. (R. at 902.) In commenting on Dr. Webster's opinion, the ALJ stated,

> The opinion by the internal medicine consultative examiner, Thomas Webster, MD, is partially persuasive. Dr. Webster opines the claimant retains the ability to lift and carry in the light range, **sit for periods of an hour for a total of six hours; stand or walk for periods of 10 minutes for a total of 1 hour standing and 1 hour walking;** frequently reach and continuously handle, finger, feel, push and pull with the right hand; but never climb ladders or scaffolds or balance; continuous climb ramps and stairs; and occasionally stoop, kneel, crouch, and crawl. The claimant should avoid unprotected heights, frequent moving mechanical parts, continuously operate a vehicle, never have exposure to vibration, and occasional exposure to humidity, wetness fumes, odors, dusts, gases, and poor ventilation, and extreme heat and cold and needs library noise conditions, quiet. (Exhibit 5F). Dr. Webster's physical examination findings support his opinion. Pertinent consultative examination findings include visual acuity with glasses 20/40 right eye and 20/30 left eye; normal gait; ability to walk on heels and toes without difficulty; full squat; normal stance; no use of assistive devices; clear lungs; regular heart rate and rhythm; soft, nontender abdomen; negative straight leg raising; no joint deformity; decreased right shoulder range of motion; physiologic DTRs; no sensory deficit; 5/5 strength in the upper and lower extremities; no edema; physiologic pulses; hand and finger dexterity intact; and 100 percent grip strength. (Exhibit 5F). **Other medical records are consistent with light work.** Findings after rotator cuff surgery found full active range of motion but some weakness with arm drop testing but does not give way. She had 3-4/5 strength with external rotation versus resistance but a normal motor and neurovascular exam distally. Her left arm showed full active forward flexion but pain at 90 degrees and beyond. She had some weakness on external rotation versus resistance and give way with drop testing but intact distal motor and neurovascular findings on the left. (Exhibit 24F/12-13). **Thus, the opinion is partially persuasive.**

(Id.) (emphasis added). Read in context, the ALJ stated that Dr. Webster's examination findings supported his opinion, but "other records are consistent with light work." (Id.)

The ALJ noted at the initial level review, and upon reconsideration, the state agency medical consultants determined plaintiff was able to work at least at the light exertional level (medium level on initial review, which the ALJ rejected in favor of light work), with plaintiff being able to "stand and/or walk (with normal breaks) **for a total of**: **about 6 hours in an 8 hour workday.**" (R. at 81-82, 98) (emphasis added). Plaintiff contends Dr. Webster found greater standing/walking limitations, as compared to the six-hour standing/walking limitations found by the state agency medical examiners, and those additional limitations were required to be noted in plaintiff's RFC. (Pl.'s Br., ECF No. 17 at 10.) Plaintiff believes Dr. Webster's finding limiting plaintiff to one hours of standing or walking each in an eight-hour workday, which would limit plaintiff to "sedentary" work, rather than "light" work as determined by the ALJ.

The ALJ considered Dr. Webster's opinion and both state agency consultants' opinions. Considering plaintiff's medical record as a whole, the ALJ determined Dr. Webster's opinion was only partially persuasive; plaintiff was capable of "light" work and was not to sedentary work as Dr. Webster would have limited plaintiff. As the Third Circuit Court of Appeals noted in Jones v. Barnhart, 364 F.3d 501 (3d Cir. 2004),

> *Burnett* does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis. Rather, the function of *Burnett* is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.

Jones, 364 F.3d at 505. (referencing Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 120 (3d Cir. 2000). There is sufficient explanation in the ALJ's decision to be able to meaningfully review the decision and determine there is substantial evidence for his findings.

**2. Failure to Adequately Articulate How Each Opinion Was Considered and Conflicting Limitations Were Reconciled When Formulating Plaintiff's RFC**

Plaintiff asserts that by finding the opinions of each medical source in plaintiff's record "partially persuasive" the ALJ has failed to reconcile the different restrictions that were proposed in each of the opinions. (Pl.'s Br. ECF No. 17 at 11.) The ALJ explained that he found persuasive some portions of Dr. Webster's opinion and some portions of each of the state agency consultants' opinions to determine what work-related functions were supported by the record as a whole. The initial state agency medical reviewer, who considered Dr. Webster's opinion remarked that the "opinion is an overestimate of the severity of the individual's restrictions/limitations." (R. at 88.) Upon reconsideration, Dr. Mortimer's opinion noted:

> The claimant has described daily activities that are not significantly limited. This is consistent with the limitations indicated by other evidence in this case. She indicates that she is able to drive a car, do some shopping and household chores. She has received treatment from a specialist for her impairments. She has had vestibular therapy and has been prescribed appropriate medications for the alleged impairments. The record reveals that the treatment has been at least partially successful in controlling her symptoms. She attends physical therapy. At PT evaluation, 12/10/2021, her right shoulder had passive 150 degrees abduction and 150 degrees flexion, and active 110 degrees flexion, 90 degrees abduction. There is no evidence in file of frequent exacerbations of asthma, or migraines, in the past year requiring physician intervention.

(R. at 99.)

As the ALJ noted in the decision: "A claimant's residual functional capacity must represent the most, not the least, work-related activities that they are capable of doing on a regular and continuing basis despite their impairments and limitations. (20 CFR 404.1545 and

Social Security Ruling 96-8p).” (R. at 897.) The ALJ concluded the record supported the ALJ’s RFC determination. (Id.) With respect to light work, the ALJ determined the assessments from other reviewing medical professionals, specifically Dr. Mortimer’s opinion upon reconsideration, were more appropriate findings for plaintiff’s abilities because they reviewed longitudinal evidence of plaintiff’s medical record. (R. at 903.)

Even if an administrative law judge finds an opinion to be persuasive, he or she is not required to incorporate every limitation included in the opinion. See Irwin v. Comm'r of Soc. Sec., No. CV 19-5109, 2020 WL 1888958, at *3 (E.D. Pa. Apr. 16, 2020). Here, the ALJ explained why he adopted many of the findings from Dr. Webster’s opinion. (R. at 902.) The ALJ independently determined that the totality of plaintiff’s record supports light work, as opined by the state agency medical examiner upon reconsideration, with some postural limitations greater than those proposed by either the state agency examiners **or** Dr. Webster. (Compare R. at 896, with R. at 82-83, 99, and R. at 410.)

The ALJ did not just rubber-stamp any medical source opinion. The RFC that the ALJ determined for plaintiff ultimately included postural limitations for “never” climbing ladders, ropes, or scaffolds, “occasionally” climbing ramps and stairs, and “frequently” balancing, stooping, kneeling, crouching, and crawling. (R. at 896.) The ALJ utilized plaintiff’s record as a whole to develop the RFC, taking into account some aspects from each of the opinions available to him. Notably, “[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved for the Commissioner.” Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability: Law and Procedure in Federal Court 447 (2025 ed., Thomson Reuters, 2025) (quoting Winn v. Comm'r Soc. Sec. Admin., 894 F.3d 982,

987 (8th Cir. 2018)). See Zappala v. Barnhart, 192 F. App'x 174, 177 (3d Cir. 2006) ("[T]he possibility that two inconsistent conclusions may be drawn from the evidence contained in the administrative record does not prevent an agency's finding from being supported by substantial evidence.").

**3. Failure to Develop an Accurate RFC Containing "All" of Plaintiff's Impairments by Minimizing the Findings of the Neuropsychological Testing and Cherry-Picking Statements from Plaintiff's Record to Counter Plaintiff's Statements About Intensity and Limiting Effects of Her Symptoms**

Plaintiff asks this court to consider whether the RFC developed by the ALJ only captures what plaintiff can do intermittently, rather than on a sustained and continuing basis, which would violate the mandate in SSR 96-8p. (Pl.'s Br. ECF No. 17 at 13.) This court needs to consider whether the ALJ's decision is supported by substantial evidence.

> A judge may consider many factors yet base a decision on just one or two. And those one or two are the "reasons upon which [the denial of benefits] is based." 42 U.S.C. § 405(b)(1). The statute requires administrative judges to explain only the dispositive reasons for their decisions, not everything else that they considered.
>
> …
>
> Administrative judges must always discuss the two most important factors: supportability and consistency. 20 C.F.R. § 404.1520c(b)(2). But if opposing medical opinions are equally well-supported and consistent, then supportability and consistency are not dispositive. … So under the regulation, administrative judges must always explain the reasons for their decisions. But that does not mean always explaining **all** the factors.

Zaborowski v. Comm'r of Soc. Sec., 115 F.4th 637, 639 (3d Cir. 2024) (emphasis added).

Plaintiff contends that by not accepting Dr. Groves' opinion in its entirety, the ALJ's development of plaintiff's RFC was faulty and did not account for plaintiff's limitations to perform sustained work. (Pl.'s Br. ECF No. 17 at 13.) Dr. Groves' second comprehensive cognitive evaluation "testing results included severe impairments in visual and verbal memory,"

as noted by the ALJ. (R. at 901.) Here, the ALJ fully evaluated Dr. Groves' opinion and found that opinion partially persuasive. The ALJ also considered the opinions of the state agency mental health reviewers, who each had access to consider the consultive mental status evaluation conducted by Dr. Gallo. (R. at 87, 101.) They each determined plaintiff's statements about the intensity, persistence and limiting effects of plaintiff's mental health impairments were "partially consistent" with plaintiff's medical record. (Id.) Specifically, upon reconsideration, the opinion of state agency consultant Dr. Turner noted:

> [Plaintiff's] basic memory processes are intact. The claimant can understand, retain, and follow simple instructions (i.e., perform one- and two-step tasks). The claimant can make simple decisions and would not require special supervision in order to sustain a routine. The claimant can perform simple, routine, repetitive tasks in a stable environment. The claimant is capable of performing within a schedule and at a consistent pace.
> The claimant is able to maintain socially appropriate behavior and can perform the personal care functions needed to maintain an acceptable level of personal hygiene. The claimant is capable of asking simple questions and accepting instruction. The claimant is able to interact appropriately with the general public. The claimant is able to get along with others without distracting them. The claimant can exercise appropriate judgment.
> All GAF scores from acceptable medical sources were considered and are appropriately supported.
> **The claimant is able to meet basic mental demands on a sustained basis despite the limitations resulting from impairments.**

(R. at 101) (emphasis added).

"[The administrative law judge] must also give serious consideration to the claimant's subjective complaints, even when those assertions are not confirmed fully by objective medical evidence." Niewierski v. Astrue, 737 F. Supp. 2d 459, 470 (W.D. Pa. 2010); see Mason v. Shalala, 994 F.2d 1058, 1067–68 (3d Cir. 1993). Here, the ALJ found plaintiff's traumatic brain injury, bilateral rotator cuff tear, depression, and anxiety to be severe medical impairments in

step two.[7] (R. at 894.) The severity of those impairments' impact on level of functioning on a sustained basis, was considered across the totality of plaintiff's medical record. According to the Third Circuit Court of Appeals:

> Allegations of pain and other subjective symptoms must be supported by objective medical evidence. See 20 C.F.R. § 404.1529. Once an ALJ concludes that a medical impairment that could reasonably cause the alleged symptoms exists, he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work. This obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it. See 20 C.F.R. § 404.1529(c).

Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). Plaintiff maintains that if Dr. Groves' opinion was more fully accepted, then plaintiff's testimony at the hearings would have been consistent with her statements about the intensity and limiting effects of her symptoms, most especially about her stamina and her ability to perform for a full workday. (Pl.'s Br. ECF No. 17 at 14.)

The opinions of the state mental health examiners, however, especially upon reconsideration, led the ALJ to conclude that despite plaintiff's severe mental health impairments, she was capable to perform sustained work. The ALJ determined plaintiff's RFC and the work-related limitations he found based on factors such as her activities of daily living, and response to therapies and medication. The ALJ explained, based on the totality of plaintiff's record, the reasons for his conclusions in the development of plaintiff's RFC, which included numerous functional, exertional, postural, and environmental limitations to

7. Plaintiff's other physical conditions were also considered, but are not relevant to the issues raised on appeal, and will not be discussed.

accommodate for plaintiff's severe and non-severe physical and mental health impairments. (R. at 899-901.)

Plaintiff asserts that the ALJ reduced plaintiff's limitations to "generic restrictions" and "boilerplate limitations," and relies on Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir. 2004), and Hess v. Commissioner of Social Security, 931 F.3d 198, 211 (3d Cir. 2019), to support her argument that phrases contained in the RFC such as "detailed but uninvolved written or oral instructions" and "no strict production rates" are insufficient to address plaintiff's deficiencies in "persistence, pace, or – critically here – stamina." (Pl.'s Br. ECF No. 17 at 14; R. at 896.) Plaintiff is correct that the court of appeals in Ramirez disagreed that "the ALJ's use of 'simple repetitive one, two-step tasks' in the hypothetical was sufficiently descriptive to encompass the findings concerning the claimant's limited intellectual functioning." Ramirez, 372 F.3d at 552. The Third Circuit Court of Appeals, however, clarified its position in Hess:

> In sum, Ramirez did not hold that there is any categorical prohibition against using a "simple tasks" limitation after an ALJ has found that a claimant "often" faces difficulties in "concentration, persistence, or pace." Rather, a "simple tasks" limitation is acceptable after such a finding, as long as the ALJ offers a valid explanation for it.

Hess, 931 F.3d at 212. The defendant argued the ALJ correctly determined plaintiff's RFC because the ALJ pointed to plaintiff's daily activities when considered with the medical evidence submitted to support the ALJ's conclusions about the RFC. (Def.'s Br. ECF No. 18 at 10.)

In Ramirez, a finding that the plaintiff could "could perform simple, routine unskilled work" did not sufficiently address the ALJ's other notations "that Ramirez 'often' experienced 'deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner' … . The ALJ's hypothetical, however, had not mentioned this particular

limitation." Ramirez, 372 F.3d at 548-49. The ALJ in this case, however, provided the "valid explanation" as required by Hess, "to set forth a rationale for [his] RFC findings." Hess, 931 F.3d at 212. The ALJ concluded each paragraph of discussion of the findings in medical opinions with a statement explaining how the opinion was tied to the limitations in the RFC, or differed from it, based on abilities plaintiff demonstrated in other aspects of the record. (R. at 898-901, 906.) Subsequent paragraphs discussing the persuasiveness of the medical opinions concluded with explanations of other findings to explain why the opinions were "partially persuasive." (R. at 902-905.) Here, as in Hess,

> [t]he government argues that the ALJ did so by analyzing Hess's difficulties in "concentration, persistence, or pace" and concluding that they were not so serious that Hess could not perform simple tasks. Hess's only response is that "the ALJ failed to set forth a supported rationale for [her] RFC findings." (Answering Br. at 5.) He does not assert that the ALJ mischaracterized the record, only that her analysis is flawed.

Hess, 931 F.3d at 213. While plaintiff, or this court, may view the situation differently, and this case presents a somewhat close question because the ALJ could have better explained his analysis, the explanation was sufficient and there is substantial evidence to support the RFC developed by the ALJ and the ALJ's decision.

**4. Without an Accurate RFC, Any Hypotheticals Presented to the VE Were Not Substantial Evidence**

Plaintiff additionally argues that the RFC the ALJ used to pose hypothetical questions to the VE did not contain "all" plaintiff's limitations, because it did not reflect the greater limitations assessed by Dr. Webster and acknowledge the full impact of plaintiff's memory limitations and cognitive stamina as expressed in Dr. Groves' opinion. (Pl.'s Br., ECF No. 17 at 14). Plaintiff relies on Ramirez, 372 F.3d at 554, as support for her position that the ALJ erred

in not presenting greater limitations to the VE. Plaintiff, however, does not acknowledge that Hess recognizes that the "functional limitation findings do not dictate the terms of the ALJ's statement of the claimant's limitations in the final analytical steps." Hess, 931 F.3d at 210. Plaintiff must establish that the record otherwise suggests that greater limitations must be "clearly established in the record." Durden, 191 F. Supp. 3d at 459 (quoting Santiago-Rivera v. Barnhart, No. CIV.A. 05-5698, 2006 WL 2794189, at *11 (E.D. Pa. Sept. 26, 2006) (emphasis in original). The ALJ presented hypotheticals to the VE based those the RFC he determined. The VE's identification of jobs a hypothetical person with an RFC like plaintiff would be able to perform that exist in significant numbers in the national economy took those limitations into consideration. The ALJ explained the RFC and the reasons for accepting the testimony of the VE based on the VE's experience, and use of "the DOT as well as the SCO, and [her] education, training, and experience as a vocational counselor." (R. at 933.)

As discussed above, the ALJ must develop the record and "[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved for the Commissioner." Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability: Law and Procedure in Federal Court 447 (2025 ed., Thomson Reuters, 2025) (quoting Winn v. Comm'r Soc. Sec. Admin., 894 F.3d 982, 987 (8th Cir. 2018)). The ALJ considered each available assessment and determined plaintiff's RFC based on the totality of the record. Just as the ALJ found each of the opinions of the examining physicians and the consultative state agency reviewers partially or somewhat persuasive when it came to plaintiff's physical limitations, so too did he scrutinize the psychological opinions available in the record. (R. at 900-01.) The ALJ found both the state agency mental health reviewer opinions, at initial

level and upon reconsideration, "partially persuasive." (R. at 903-04.) The state reviewers each found a mix of mild and moderate mental health limitations. (R. at 78, 96.) The ALJ also found that plaintiff's "[o]ther records are consistent with moderate mental limitations. Mental status examinations in 2024 were generally unremarkable except 'down' mood and anxious affect." (R. at 904.) Considering Dr. Groves' opinion, specifically, the ALJ found that while plaintiff "reported some functional limitations, she was able to function independently. … Other records (noted above herein)[8] are consistent with the ability to function independently despite cognitive limitations." (R. at 904-05.) The ALJ was not required to accept the higher-level of the limitations proposed by Dr. Groves after the ALJ had determined the "moderate" level findings based upon the record were the appropriate level for plaintiff's mental health work-related abilities. The RFC that the ALJ determined for plaintiff ultimately included numerous environmental and functional limitations to account for plaintiff's impairments. (See R. at 898-901.) The ALJ, in determining plaintiff's RFC, explained the work-related limitations he found after review of the record, specifically moderate mental health impairments, which satisfies the "valid explanation" standard called for in Hess. Hess, 931 F.3d at 211.

---

8. In other paragraphs of the decision, the ALJ noted: "Her thoughts were logical and organized;" (R. at 900); "she could take her medications independently… the claimant is able to manage money, shop, provide childcare, and drive;" (R. at 901); "she prepares meals, does laundry, light cleaning, shops, walks, rides or drives a car, walks her dog 20 minutes per day; plays video games; and enjoys social media;" (R. at 902); "records suggested the claimant engage in aerobic exercise and noted she walked her dog, played outside with her kids, cut the hedges, and drives. She reported engaging in organized protests and increased household chores. … noted managing her activities of daily living such as cooking, cleaning, and laundry limited by her rotator cuff injury. She could shop, manage her own money, and drive. (Exhibit 6F/5). Other records generally establish retained functioning in a broad range of activities, such as dealing with her special needs children and a reduction in the services provided to them. These activities are done without supervision… ." (R. at 903).

The ALJ presented the RFC he determined applicable for plaintiff's limitations to the VE. The VE identified jobs a hypothetical person with an RFC like plaintiff would be able to perform that exist in significant numbers in the national economy, taking those limitations into consideration. (R. at 931.) The ALJ, in his decision, sufficiently explained the reasons, based on the totality of plaintiff's record, for his conclusions in the development of plaintiff's RFC and for accepting the testimony of the VE based on the VE's expert testimony consistent with the "DOT, SCO as well as the vocational expert's education, training, and experience as a vocational counselor" (R. at 907.) While plaintiff may view the situation differently, there is substantial evidence to support the RFC developed by the ALJ and the ALJ's acceptance of explanations given by the VE of jobs available in the economy that plaintiff could perform.

## VI. CONCLUSION

The ALJ explained why he developed the RFC that he did, with multiple limitations included for less than the full range of work available at the light exertional level, taking into account all plaintiff's impairments. The hypothetical presented to the VE included all the limitations from the RFC and the VE found jobs that exist in the national economy for an individual with an RFC like plaintiff's RFC. The ALJ sufficiently explained his decisions for developing the RFC, his presentation of the RFC to the VE in a hypothetical, and his acceptance of the VE's findings of available jobs that plaintiff could perform.

Having considered the parties' motions, the record as a whole and the applicable law, the court finds there is substantial evidence in the record to affirm the ALJ's decision. The court will affirm the decision of the Commissioner.

An appropriate order and judgment will be entered.

Dated: September 2, 2026

BY THE COURT:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
Senior United States District Judge